**PANAVISION INTERNATIONAL, L.P., a Delaware Limited Partnership, Plaintiff,**

**v.**

**Dennis TOEPPEN, an individual, Network Solutions, Inc., a District of Columbia Corporation, and DOES 1–50, Defendants.**

**No. CV 96–3284 DDP (JRx).**

United States District Court, C.D. California.

Nov. 5, 1996.

William E. Thomson, Jr., Ivy Kagan Bierman, Sean A. Luner, Kaye Scholer Fierman Hays & Handler, Los Angeles, CA, for Panavision International LP.

Bruce W. Hamby, Orange, CA, Joseph D. Murphy, Meyer, Capel, Hirschfeld, Muncy, Jahn & Aldeen, Champaign, IL, for Dennis Toeppen.

Edward G. Poplawski, Suzanne R. Jones, Pretty Schroeder Brueggeman & Clark, Los Angeles, CA, for Network Solutions, Inc.

PREGERSON, District Judge.

Plaintiff Panavision's motion for summary judgment against defendant Dennis Toeppen for federal and state trademark dilution, federal trademark infringement, and federal unfair competition came before the Court on October 7, 1996. Toeppen's cross motion for summary judgment came before the Court on October 21, 1996. After reviewing and considering the materials submitted by the parties and hearing oral argument, the Court grants in part and denies in part both motions.

## I. BACKGROUND

The issue presented by this litigation is whether the defendant violated federal or California state law by intentionally registering the plaintiff's trademarks as his Internet domain names for the purpose of exacting payment from the plaintiff in exchange for the termination of the registrations of the domain names. The Court concludes that the defendant's conduct dilutes the plaintiff's trademarks in violation of the Federal Trademark Dilution Act of 1995, 15 U.S.C. § 1125(c), and the California dilution statute, Cal.Bus. & Prof.Code § 14330. Accordingly, the Court grants the plaintiff's motion for summary judgment and enjoins the defendant from further violations of the dilution statutes.

Plaintiff Panavision International, L.P. ("Panavision") is a Delaware limited partnership with its principal place of business in Los Angeles, California. Panavision owns several federally registered trademarks, including "Panavision" and "Panaflex" (the "Panavision marks"), which it uses in connec-

tion with its theatrical motion picture and television camera and photographic equipment business.

Defendant Dennis Toeppen ("Toeppen") is an individual residing in Illinois. Toeppen owns several web sites, including the two at issue in this case, "panavision.com" and "panaflex.com."

Defendant Network Solutions, Inc. ("NSI") is a District of Columbia corporation with its principal place of business in Herndon, Virginia. NSI registers Internet domain names. NSI is not involved in the instant summary judgment motions.

The Internet is an international computer "super-network" of over 15,000 computer networks used by approximately 30 million individuals, corporations, organizations, and educational institutions worldwide. *See generally American Civil Liberties Union v. Reno*, 929 F.Supp. 824, 830–848 (E.D.P.A. 1996) (discussing the Internet). In recent years, businesses have begun to use the Internet to provide information and products to consumers and other businesses.

Every computer that has access to the Internet has a unique address. All Internet addresses consist of four groups of digits separated by periods that indicate the network, subnetwork, and local address. For example, an Internet address might read "231.35.1.19". This address is referred to as the "IP address."

Every Internet address also has a unique alphanumeric equivalent to its IP address referred to as its "domain name." Domain names consist of a string of "domains" separated by periods. Most business domain names consist of two domains. First, there is the "top-level" domain, which indicates the type of organization using the name. Commercial entities use the ".com" top-level domain name, while other top-level domain names include ".net," which is used by networks, and ".edu," which is used by educational organizations. Next, there is the "second-level" domain, which is frequently the name of the company (or a derivative thereof) that maintains the Internet site (commonly referred to as a "web site"). In short, one purpose of domain names is to identify the entity that owns the web site.

The other primary purpose of domain names is to allow Internet users to locate web sites quickly and easily. If an Internet user knows the name of another user's web site, he or she can easily contact the site. If the user does not know the domain name, the user can search for the site using an Internet "search engine." Search engines search the Internet using "key words" selected by the searching party. A key word search will typically produce a list of the web sites that use the key words. Key word searches will frequently yield thousands of web sites. The user can access the web sites through programs called "web browsers" (some web browsers have built-in search engines). The length and success of this process is dependent upon the searching party's ability to deduce the correct key word or words and the number of other web sites that use the same key words.

Because users may have difficulty accessing web sites or may not be able to access web sites at all when they do not know (or cannot deduce) the proper domain name, businesses frequently register their names and trademarks as domain names. Therefore, having a known or deducible domain name is important to companies seeking to do business on the Internet, as well as important to consumers who want to locate those businesses' web sites.

NSI does not make an independent determination of an applicant's right to use a domain name. However, since at least November 23, 1995, NSI has required applicants, including Toeppen, to make certain representations and warranties, including: (1) that the applicant's statements in the application are true and the applicant has the right to use the requested domain name; (2) that the use or registration of the domain name does not interfere with or infringe the rights of any third party with respect to trademark, service mark, trade name, company name or any other intellectual property right; and (3) that the applicant is not seeking to use the domain name for any unlawful purpose, including tortious interference with contract or prospective business advantage,

unfair competition, injuring the reputation of another, or for the purpose of confusing or misleading a person, whether natural or incorporated.

In December of 1995, Toeppen applied for and received registration of the Internet domain name "panavision.com." Toeppen is not, and never has been, authorized to use any Panavision marks.

After registering the "panavision.com" domain name, Toeppen established a web site displaying aerial views of Pana, Illinois. At no time did Toeppen use the "panavision.com" name in connection with the sale of any goods or services.

Like many businesses, Panavision recently decided to do business on the Internet. When Panavision attempted to establish a web site under its own name, it discovered that Toeppen had registered "panavision.com" as his domain name. Therefore, Panavision was unable to register and use its trademark as an Internet domain name.

When Panavision notified Toeppen of its desire to use the "panavision.com" domain name, Toeppen demanded $13,000 to discontinue his "use" of the domain name. Panavision refused Toeppen's demand. Toeppen then registered Panavision's "Panaflex" trademark as the domain name "panaflex.com." The "panaflex.com" web site contains only the word "hello." NSI has placed both domain names "on hold" pending the outcome of this litigation.

Panavision asserts, and Toeppen does not deny, that he is also a defendant in trademark actions brought by American Standard, Inc. and Intermatic, Inc. because of Toeppen's registration of "americanstandard.com" and "intermatic.com" as domain names and demands for money to relinquish control of the names. Toeppen is also the registered owner of several other domain names that are based on trademarks and trade names, including: aircanada.com, anaheimstadium.com, arriflex.com (Arriflex is Panavision's main competitor), australiaopen.com, camdenyards.com, deltaairlines.com, eddiebauer.com, flydelta.com, frenchopen.com, lufthansa.com, neiman-marcus.com, northwestairlines.com, and yankeestadium.com.

Panavision asserts that Toeppen's "business" is to register well known marks and exact payment from the mark's owners, including Panavision.

On May 7, 1996, Panavision brought claims against Toeppen and NSI in the Central District of California for: 1) federal dilution of trademark; 2) state dilution of trademark; 3) federal trademark infringement; 4) federal unfair competition; 5) unfair competition; 6) intentional interference with prospective economic advantage; 7) negligent interference with prospective economic advantage; and 8) breach of contract.

Panavision moved for summary judgment against Toeppen for federal and state trademark dilution, federal trademark infringement, and federal unfair competition. Toeppen moved for summary judgment on all claims.

## II. DISCUSSION

This Court has original subject matter jurisdiction over the Lanham Act claims pursuant to 28 U.S.C. §§ 1331 and 1338(a) and pendant jurisdiction over the California state law claims pursuant to 28 U.S.C. § 1338(b). This Court has personal jurisdiction over Toeppen by virtue of Toeppen's intentional actions, which were expressly aimed at California and which caused harm, the brunt of which was suffered—and which Toeppen knew was likely to be suffered—in California. *See Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984); *see also Panavision International, L.P. v. Toeppen*, 938 F.Supp. 616 (C.D.Cal.1996) (denying defendant Toeppen's motion to dismiss for lack of personal jurisdiction). Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this litigation occurred in California.

### A. *Standards for Summary Judgment.*

Summary judgment is appropriate when there "is no genuine issue of material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In order to defeat a motion for summary judgment, there must be facts in dispute that are both genuine and material, i.e., there must be facts upon which a fact finder could "reasonably find" for the non-moving party. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). The court does not weigh the evidence or make credibility determinations; rather, the court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *Id.*

The initial burden of establishing that there is no genuine issue of material fact lies with the moving party. Fed.R.Civ.P. 56(c); *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552–53; *British Airways Board v. Boeing Co.*, 585 F.2d 946, 951 (9th Cir.1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). Once the movant has met this burden by producing evidence that, if left uncontroverted, would entitle the moving party to a directed verdict at trial, the burden shifts to the non-movant to present specific facts showing that there is a genuine issue of material fact. *See* Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *Lake Nacimiento Ranch Co. v. San Luis Obispo*, 841 F.2d 872, 876 (9th Cir.1987), *cert. denied*, 488 U.S. 827, 109 S.Ct. 79, 102 L.Ed.2d 55 (1988).

Summary judgment is disfavored in trademark cases because of the inherently factual nature of most trademark disputes. *See Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1355 (9th Cir.1985). Nonetheless, summary judgment is appropriate "where the party opposing the motion fails to demonstrate the existence of any material issues of fact for trial." *Sykes Laboratory, Inc. v. Kalvin*, 610 F.Supp. 849, 860 (C.D.Cal.1985).

B. *Federal and State Trademark Dilution.*[1]

Traditionally, trademark law has permitted multiple parties to use the same mark for different classes of goods or services. Trademark law only prohibited use of the same mark on competing goods or services (expanded by the Lanham Act in 1946 to prohibit uses on non-competing but "related" goods or services) where there was a likelihood of consumer confusion as to the origin of the goods or services with which the user associated the mark.

Trademark dilution laws, however, changed the traditional trademark analysis. Trademark dilution laws protect "distinctive" or "famous" trademarks from certain unauthorized uses of the marks regardless of a showing of competition or likelihood of confusion. *See, e.g., WAWA, Inc. v. Haaf*, 1996 WL 460083, at *2 (E.D.Pa.1996). Indeed, the very purpose of dilution statutes is to protect trademarks from damage caused by the use of the marks in non-competing endeavors. *See, e.g.,* Jerome Gilson, *Trademark Dilution is Now a Federal Wrong* 9, *in* 1 Gilson, *supra* (1996). Whereas traditional trademark law sought primarily to protect consumers, dilution laws place more emphasis on protecting the investment of the trademark owners. Still, dilution laws do promote consumer welfare: if trademarks are valuable to consumers, then protecting businesses' investments in trademarks will benefit consumers by increasing the willingness of businesses to invest in the creation of recognized marks.

The Internet will also leave its imprint on trademark law, and vice versa. For example, in *Comp Examiner Agency, Inc. v. Juris, Inc.*, 1996 WL 376600 (C.D.Cal.1996), the court held that the defendant infringed the plaintiff's trademark by using the plaintiff's mark as a second-level domain name and web site to sell, distribute, advertise, and market goods and services to the same types of customers as the plaintiff, which created a likelihood of consumer confusion.

*Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531 (9th Cir.1989). For the purpose of this Order, the analysis under both the state and federal statutes is the same. Accordingly, the discussion set forth in this Order applies equally to Panavision's state law dilution claim.

---

1. The California dilution statute is substantially similar to the federal dilution statute. Cal.Bus. & Prof.Code § 14330. Section 14330 prohibits dilution of "the distinctive quality" of marks regardless of the absence of competition and likelihood of confusion. This protection extends only to strong and well recognized marks. *See, e.g.,*

An area in which trademark law will have an impact on the Internet involves disputes over the right to use particular domain names. As discussed above, trademark law permits multiple parties to use the same mark for different classes of goods and services; however, the current organization of the Internet permits only one use of a domain name, regardless of the goods or services offered. That is, although two or more businesses can own the trademark "Acme," only one business can operate on the Internet with the domain name "acme.com." Such a limitation conflicts with trademark principles and hinders the use of the Internet by businesses.

Many of the issues, both legal and technical, that arise from the intersection of trademark law and the Internet are difficult to resolve.[2] Ultimately, Congressional action seems necessary.[3] Still, some Internet trademark disputes can be resolved even under traditional trademark law. *See, e.g., Comp Examiner Agency*, 1996 WL 376600 at *1; *ActMedia, Inc. v. Active Media Int'l, Inc.*, 1996 WL 466527 (N.D.Ill.1996). Other Internet trademark disputes, including the dispute in the current litigation, can be resolved under trademark dilution law. Prior to the recently enacted Federal Trademark Dilution Act of 1995 ("Dilution Act"), 15 U.S.C. § 1125(c), trademark dilution was a creature of state law, but the Dilution Act created a federal cause of action for trademark dilution by adding § 43(c) to the Lanham Act.[4]

The Dilution Act provides that "[t]he owner of a famous mark shall be entitled ... to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark...." 15 U.S.C. § 1125(c)(1).

In applying the Dilution Act, the Court must be guided by the policies underlying trademark law. The basic policy is to prevent deception of the public. Trademark law also protects the interests of trademark owners in not having the value of their marks misappropriated. Finally, trademark law encourages competition and economic efficiency from which the public benefits. *See* 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 2.01 (1996).

1. *The Panavision marks are famous marks.*

The statute sets forth eight nonexclusive factors that courts "may consider" when determining whether the mark being litigated is a "famous" mark. These factors are: (1) "the degree of inherent or acquired distinctiveness of the mark;" (2) "the duration and extent of use of the mark in connection with the goods or services with which the mark is used;" (3) "the duration and extent of advertising and publicity of the mark;" (4) "the geographical extent of the trading area in which the mark is used;" (5) "the channels of trade for the goods or services with which the mark is used;" (6) "the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought;" (7) "the nature and extent of use of the same or similar marks by third parties;" and (8) "whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register."

■ The Court finds that the Panavision marks are famous marks. Panavision owns

---

**2.** NSI's standard domain name registration agreement contains a domain name dispute policy, but the policy has not proven effective in resolving domain name conflicts.

**3.** Some commentators despair of the Internet's future unless Congress intervenes. In the words of the attorney for the plaintiff in a 1996 Internet domain name dispute, "If we're going to resort to letting lawyers resolve this whole thing, then we're absolutely doomed." Robert Gurrola, *District Court Rules for Trademark Owner in Internet*

*Domain Name Dispute*, West's Legal News, 1996 WL 397602 (July 17, 1996) (discussing *ActMedia, Inc. v. Active Media Int'l, Inc.*, No. 96C–3448, 1996 WL 466527 (N.D.Ill. July 17, 1996)).

**4.** Senator Patrick Leahy (D–VT) stated that he "hope[d] that this antidilution statute can help stem the use of deceptive Internet addresses taken by those who are choosing marks that are associated with the products and reputations of others." 141 Cong.Rec. S 19312 (daily ed. Dec. 29, 1995) (statement of Sen. Leahy).

the federal registration for the Panavision marks. The distinctiveness and fame of the "Panavision" marks are well established and undisputed. Neither mark can be found in the dictionary. The "Panavision" mark in particular has developed strong secondary meaning because of Panavision's long period of exclusive use of the mark and its status as a major supplier of photographic equipment.

Panavision extensively advertises its marks, as it has since it first created and used the "Panavision" mark in 1954. This advertising is directed to the general public, individuals such as producers and directors, and to companies such as studios, television networks, and production companies. In addition, Panavision's "Filmed With Panavision" credit appears in the "end titles" of many television shows and movies on a daily basis. The Panavision marks are famous marks entitled to protection under the Dilution Act.

2. *Toeppen's use of the Panavision marks is a "commercial use" of the marks.*

■ Registration of a trade as a domain name, without more, is not a commercial use of the trademark and therefore is not within the prohibitions of the Act. In the case before the Court, however, Toeppen has made a commercial use of the Panavision marks.[5]

Toeppen's "business" is to register trademarks as domain names and then to sell the domain names to the trademarks' owners. Toeppen's business is evident from his conduct with regard to Panavision and his conduct in registering the domain names of many other companies. His "business" is premised on the desire of the companies to use their trademarks as domain names and the calculation that it will be cheaper to pay him than to sue him. Panavision, however, chose to litigate rather than to accede to Toeppen's $13,000 "fee."

The Dilution Act specifically excludes certain conduct from the coverage of the Act: "[1.] [f]air use of a famous mark by another

person in comparative commercial advertising or promotion to identify the competing goods or services of the owner of the famous mark; [2.] [n]oncommercial use of a mark; [3.] all forms of news reporting and news commentary." *Cf. Lucasfilm, Ltd. v. High Frontier,* 622 F.Supp. 931, 935 (D.D.C.1985) (holding that use of the trademark "Star Wars" by public interest groups in "political propaganda, newspapers or noncommercial, [or] non-trade references" to the Strategic Defense Initiative would not undermine the plaintiff's rights in the mark).

The exception for non-commercial use of a famous mark is intended to prevent courts from enjoining constitutionally-protected speech. Gilson, *supra,* 15. That is, the exclusion encompasses conduct such as parodies and consumer product reviews. *Id.* According to Sen. Orrin G. Hatch (R–Utah), the Chairman of the Senate Judiciary Committee, "[t]he bill will not prohibit or threaten noncommercial expression, such as parody, satire, editorial and other forms of expression that are not a part of a commercial transaction." *Id.; see Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.,* 924 F.Supp. 1559, 1573–74 (S.D.Cal.1996) (holding that parody, although used by defendant to sell more copies of the book at issue in the litigation, was expressive use and thus not within the prohibitions of the Act).

Permissible, non-trademark uses stand in sharp contrast to Toeppen's use of the Panavision marks. Toeppen traded on the value of the marks as marks by attempting to sell the domain names to Panavision. This conduct injured Panavision by preventing Panavision from exploiting its marks and it injured consumers because it would have been difficult to locate Panavision's web site if Panavision had established a web site under a name other than its own.

3. *Toeppen's use of the Panavision marks as domain names dilutes the marks.*

The term "dilution" is defined in 15 U.S.C. § 1127 as "the lessening of the capacity of a

---

5. The Dilution Act requires that the "commercial use" be "in commerce." "Commerce" is defined as "all commerce which may lawfully be regulated by Congress." 15 U.S.C. § 1127. Toeppen's conduct was clearly commerce within this definition.

famous mark to identify and distinguish goods or services, regardless of the presence or absence of—(1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake, or deception."

The precise scope of the conduct included within the definition of "dilution" as used in the federal Dilution Act has not yet been established. Traditionally, state dilution statutes have been concerned with conduct that dilutes a trademark either by tarnishing the mark or blurring its distinctiveness.

■ "Tarnishment" occurs when a famous mark is linked to products of poor quality or is portrayed in an unwholesome manner. Gilson, *supra*, 10. An example of tarnishment is seen in *Hasbro, Inc. v. Internet Entertainment Group, Ltd.*, 1996 WL 84853, at *1 (W.D.Wash.1996), where an adult entertainment group diluted Hasbro's "Candy Land" mark by using the name Candyland to identify a sexually explicit Internet site and by using "candyland.com" as the domain name for the site.

■ "Blurring" involves a "whittling away" of the selling power and value of a trademark by unauthorized use of the mark. Gilson, *supra*, 10. Examples of blurring would be "Pepsi" in-line skates or "Microsoft" lipstick. *Id.*

Both prohibitions act to preserve the value of the trademark in representing the owner's goods or services and the ability of the trademark to serve as a unique symbol to consumers of the source of goods or services. *See Dr. Seuss Enterprises*, 924 F.Supp. at 1573 (noting that the Dilution Act prohibits dilution under both the blurring and tarnishment theories); *WAWA*, 1996 WL 460083 at *2 (analyzing Dilution Act claim under both blurring and tarnishment theories).

■ Toeppen's conduct varies from the two standard dilution theories. As a result of the current state of Internet technology, Toeppen was able not merely "to lessen[ ] the capacity of a famous mark to identify and distinguish goods or services," 15 U.S.C. § 1127, but to eliminate the capacity of the Panavision marks to identify and distinguish Panavision's goods and services on the Internet. The Court finds that Toeppen's conduct, which prevented Panavision from using its marks in a new and important business medium, has diluted Panavision's marks within the meaning of the statute. *Cf. Deere & Co. v. MTD Products, Inc.*, 41 F.3d 39, 44 (2nd Cir.1994) (noting that "the blurring/tarnishment dichotomy does not necessarily represent the full range of uses that can dilute a mark under New York law").

■ The Court holds that Toeppen has violated the federal and state dilution statutes and enjoins Toeppen from further violations of these laws. This holding will not impede free competition or lead to any of the "parade of horribles" suggested by Toeppen. This case does not grant trademark owners preemptive rights in domain names. Nor does this case grant trademark owners "rights in gross." This decision merely holds that registering a famous mark as a domain name for the purpose of trading on the value of the mark by selling the domain name to the trademark owner violates the federal and state dilution statutes. This holding successfully balances the principles of "fair competition and free competition." McCarthy, *supra*, § 24. In addition, the Dilution Act itself excepts certain uses and thereby protects parties who "innocently" register a famous trademark as a domain name (e.g., a citizen of Pana, Illinois who registers "panavision.com" in order to provide a community political forum would come under the exemption for non-commercial use).

## C. Federal and Trademark Infringement and Federal Unfair Competition.

The Court has held that Toeppen violated the federal and state dilution statutes and has enjoined Toeppen from further violation of those laws. Therefore, in view of Panavision's purpose in bringing this litigation, it is unnecessary for the Court to reach the issues of federal and state trademark infringement and federal unfair competition.

## D. Intentional Interference with Prospective Business Advantage.

The Court grants Toeppen's motion for summary judgment on Panavision's claim for

intentional interference with prospective business advantage.

■ To establish a claim of intentional interference with prospective business advantage, the plaintiff must establish: (1) a specific economic relationship between the plaintiff and some third person containing the probability of future economic benefit to the plaintiff; (2) knowledge by defendant of the existence of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) damages proximately caused by the defendant's acts. *See Youst v. Longo,* 43 Cal.3d 64, 71 n. 6, 233 Cal.Rptr. 294, 729 P.2d 728 (1987); *Buckaloo v. Johnson,* 14 Cal.3d 815, 826–29, 122 Cal. Rptr. 745, 537 P.2d 865 (1975); *Eichman v. Fotomat Corp.,* 871 F.2d 784, 800 (9th Cir. 1989).

■ Panavision has failed to present any evidence establishing a specific economic relationship containing the probability of future economic benefit between it and any customer or prospective customer. Therefore, the Court grants Toeppen's motion for summary judgment on Panavision's intentional interference with prospective economic advantage claim.

### E. *Breach of Contract.*

The Court grants Toeppen's motion for summary judgment on Panavision's breach of contract claim.

■ Under California law, a party can be a third-party contract beneficiary only if it can show that the contracting parties intended to benefit the third party and that the contract terms evidence that intent. *See, e.g., Karo v. San Diego Symphony Orchestra Ass'n,* 762 F.2d 819, 821–22 (9th Cir.1985); *Jones v. Aetna Casualty & Sur. Co.,* 26 Cal.App.4th 1717, 1724, 33 Cal.Rptr.2d 291 (1994). The third party need not be mentioned by name in the contract but must at least be a member of a class referred to in the contract and intended to benefit from the contract. *See Karo,* 762 F.2d at 821. Intended beneficiaries can enforce the contract; mere incidental beneficiaries cannot do so.

*See Jones,* 26 Cal.App.4th at 1724, 33 Cal. Rptr.2d 291.

■ Panavision alleges that Toeppen breached the Toeppen–NSI domain name registration contract by using the domain names in an unlawful manner. Panavision claims the right to enforce the contract based on its asserted status as a third-party beneficiary. Panavision claims that it is a third-party beneficiary because the representations and warranties that NSI requires of domain name applicants are made for the benefit of intellectual property owners such as Panavision.

The portions of the Toeppen–NSI contract that Panavision claims created third-party rights are found in NSI's domain name dispute policy ("Policy"). However, nothing in the Policy evidences an intent to benefit intellectual property owners. It is clear beyond question that the Policy's sole purpose is to protect NSI. Indeed, as Panavision itself stated in its opposition to defendant NSI's motion to dismiss: "NSI has chosen to take absolutely no action whatsoever to ensure that the domain names it registers do not violate the rights of third parties. In fact, NSI has repeatedly represented that it is out to protect no interests but its own."

Although third-party contract issues are questions of intent and therefore not generally amenable to summary judgment, Panavision has not established any genuine issue of material fact with regard to this claim. The Court finds that a jury could not reasonably infer that the Toeppen–NSI contract was intended to benefit intellectual property owners. Therefore, the Court grants Toeppen's motion for summary judgment with respect to Panavision's breach of contract claim.

### F. *Attorneys' Fees.*

■ Under the Lanham Act, a prevailing party can recover attorneys' fees only in "exceptional cases," 15 U.S.C. § 1117, for example, where the party has committed "extraordinary, malicious, wanton, and oppressive conduct," *Transgo, Inc. v. Ajac Transmission Parts Corp.,* 768 F.2d 1001, 1014 (9th Cir.1985), *cert. denied,* 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986).

The Court finds that an award of attorneys' fees in this case would be inappropriate. The particular trademark issues dealt with in this case are all issues of first impression. Given the overall lack of legal precedent regarding issues arising from the intersection of trademark law and the Internet, the Court declines to award attorneys' fees to Panavision.

## III. CONCLUSION

The Court finds that Toeppen has violated the Dilution Act, 15 U.S.C. § 1125(c), and the California dilution statute, Cal.Bus. & Prof. Code § 14330. Therefore, the Court grants summary judgment in favor of Panavision on its federal and state trademark dilution claims, and hereby orders:

(1) Dennis Toeppen and his agents, servants, representatives, successors, assigns, or other individuals or entities controlling, controlled by or affiliated with, and all those in privity or active concert or participation with Toeppen (collectively "Toeppen and his agents") who receive actual notice of this Order are hereby enjoined and restrained immediately:

(a) from using, attempting to use, or causing to be used, including but not limited to, registering, attempting to register, or causing to be registered, either directly or through agents, servants, representatives, successors, assigns or other individuals or entities (collectively "other entities), the "Panavision" and "Panaflex" names and marks (the "Panavision names and marks"), or any variations thereof, or any other mark confusingly similar thereto, likely to cause dilution of the Panavision names and marks or injury to Panavision's business reputation, in connection with any commercial activity on the Internet or in any other medium;

(b) from listing, printing, posting, indexing, linking, storing, or otherwise associating, either directly or through other entities, the Panavision names and marks or any other names and marks confusingly similar thereto, likely to cause dilution of the Panavision marks or injury to Panavision's business reputation, in connection with any commercial activity in any form including, but not limited to, visible, invisible, encrypted, searchable, or non-searchable forms, within web sites, web pages, home pages, Internet sites, Internet pages, databases, programs, or any other storage means, either temporary or permanent, on the Internet or any other medium;

(c) from using the Panavision names and marks, or any variation confusingly similar thereto or likely to cause dilution of the distinctiveness of the Panavision names and marks or injury to Panavision's business reputation, as a domain name or in any other medium;

(d) from otherwise engaging in acts, either directly or through other entities, of trademark dilution.

(2) Toeppen and his agents are hereby ordered to take all actions necessary to transfer the registrations of the "panavision.com" and "panaflex.com" domain names to Panavision International, L.P.

(3) Toeppen and his agents shall assign and transfer, or cause to be assigned and transferred, to Panavision, either directly or through other entities, any web sites, web pages, home pages, Internet sites, Internet pages, databases, programs, or any other storage means, using or containing the Panavision names and marks, or any variations thereof, or any other mark confusingly similar thereto or likely to cause dilution of the Panavision marks or injury to Panavision's business reputation, in any form including, but not limited to, visible, invisible, encrypted, searchable, or non-searchable forms, either temporary or permanent, on the Internet, or in any other medium.

(4) Toeppen shall file with the Court and serve upon Panavision, within thirty (30) days after the entry of this Order, a report in writing and under oath setting forth in detail the manner and form in which Toeppen has complied with this Order.

(5) Toeppen shall deliver to Panavision any and all materials in his possession or custody or under his control either directly or through other entities, that dilute Panavision's marks.

**IT IS SO ORDERED.**