189 F.3d 868 (9th Cir. 1999)
 AVERY DENNISON CORPORATION, Plaintiff-Counter-Defendant-Appellee,
v.
JERRY SUMPTON, Individually d/b/a Free View Listings Ltd.; FREE VIEW LISTINGS, LTD., an Unknown Entity, Defendants-Counter-Claimants- Appellants.
 No. 98-55810
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted June 8, 1999
Decided August 23, 1999
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted]
 G. Gervaise Davis, III, Davis & Schroeder, Monterey, California, for the defendants-counter-claimants-appellants.
 Adrian Mary Pruetz (Argued), and David W. Quinto (On the Briefs), Quinn Emanuel Urquhart Oliver & Hedges, Los Angeles, California, for the plaintiff-counter-defendant-appellee.
 Appeal from the United States District Court for the Central District of California; J. Spencer Letts, District Judge, Presiding. D.C> No. CV-97-00407-JSL.
 Before: Dorothy W. Nelson, Stephen Reinhardt, and Stephen S. Trott, Circuit Judges.
 TROTT, Circuit Judge:
 
 
 1
 Jerry Sumpton and Freeview Listings Ltd. (together, "Appellants") appeal an injunction in favor of Avery Dennison Corp., entered after summary judgment for Avery Dennison on its claims of trademark dilution under the Federal Trademark Dilution Act of 1995, 15 U.S.C. S 1125(c) (Supp. II 1996) (amending the Lanham Trademark Act of 1946, 15 U.S.C. SS 1051-1127 (1994)), and the California dilution statute, Cal. Bus. & Prof. Code S 14330 (West 1987). The district court published an opinion, 999 F. Supp. 1337 (C.D. Cal. 1998), holding that Appellants' maintenance of domain name registrations for <avery.net> and <dennison.net> diluted two of Avery Dennison's separate trademarks, "Avery " and "Dennison." (Note that when referencing Internet addresses, domain-name combinations, e-mail addresses, and other Internet-related character strings, we use the caret symbols ("< >"), in order to avoid possible confusion.) The district court then entered an injunction ordering Appellants to transfer the domain-name registrations to Avery Dennison in exchange for $300 each.
 
 
 2
 We have jurisdiction under 28 U.S.C. S 1291 (1994). Because Avery Dennison failed to create a genuine issue of fact on required elements of the dilution cause of action, we reverse and remand with instructions to enter summary judgment for Appellants and to consider Appellants' request for attorneys' fees in light of this decision.
 
 
 3
 * Background
 
 
 4
 We are the third panel of this court in just over a year faced with the challenging task of applying centuries-old trademark law to the newest medium of communication -- the Internet. (See Brookfield Communications, Inc. v. West Coast Ent. Corp., 174 F.3d 1036 (9th Cir. 1999), and Panavision Int'l, L.P. v. Toeppen, 141 F.3d 1316 (9th Cir. 1998).)Although we attempt to set out the background facts as clearly as possible, the interested reader may wish to review some of the following sources for a more complete understanding of the Internet: Brookfield, 174 F.3d at 1044-45; Intermatic, Inc. v. Toeppen, 947 F. Supp. 1227, 1230-32 (N.D. Ill. 1996); and Marshall Leaffer, Domain Names, Globalization and Internet Commerce, 6 Ind. J. Global Legal Stud. 139, 139-46 (1998).
 
 
 5
 Two communicative functions of the Internet are relevant to this appeal: the capacity to support web sites and the corollary capacity to support electronic mail ("e-mail"). A web site, which is simply an interactive presentation of data which a user accesses by dialing into the host computer, can be cre- ated by any user who reserves an Internet location -- called an Internet protocol address -- and does the necessary programming. Because an Internet protocol address is a string of integer numbers separated by periods, for example, <129.137.84.101>, for ease of recall and use a user relies on a "domain-name combination" to reach a given web site. The registrar of Internet domain names, Network Solutions, Inc. ("NSI"),[1] maintains a database of registrations and translates entered domain-name combinations into Internet protocol addresses. When accessing a web site, a user enters the character string <http://www.>,[2] followed by the reserved domainname combination. The domain-name combination must include a top-level domain ("TLD"), which can be <.com>, <.net>, <.org>, <.gov> or <.edu>, among others, although some, like <.gov> and <.edu>, are reserved for specific purposes. The combination also includes a second-level domain ("SLD"), which can be any word not already reserved in combination with the TLD.[3] Once a domain-name combination is reserved, it cannot be used by anybody else, unless the first registrant voluntarily or otherwise relinquishes its registration.
 
 
 6
 A web site can be programmed for multiple purposes. Some merchants maintain a form of "electronic catalog" on the Internet, permitting Internet users to review products and services for sale. A web site can also be programmed for email, where the provider licenses e-mail addresses in the format <alias@SLD.TLD>, with <alias> selected by the e-mail user. A person or company maintaining a web site makes money in a few different ways. A site that aids in marketing goods and services is an asset to a merchant. E-mail providers make money from licensing fees paid by e-mail users. Money is also made from advertising and links to other web sites.
 
 II
 Facts
 
 7
 Sumpton is the president of Freeview, an Internet e-mail provider doing business as "Mailbank." Mailbank offers "vanity" e-mail addresses to users for an initial fee of $19.95 and $4.95 per year thereafter, and has registered thousands of domain-name combinations for this purpose. Most SLDs that Mailbank has registered are common surnames, although some represent hobbies, careers, pets, sports interests, favorite music, and the like. One category of SLDs is titled "Rude" and includes lewd SLDs, and another category, titled "Business," includes some common trademark SLDs. Mailbank's TLDs consist mainly of ; and , but some registered domain name combinations, including most in the "Business" and "Rude" categories, use the TLD . Mailbank's surname archives include the domain-name combinations and .
 
 
 8
 Avery Dennison sells office products and industrial fasteners under the registered trademarks "Avery" and "Dennison," respectively. "Avery" has been in continuous use since the 1930s and registered since 1963, and "Dennison" has been in continuous use since the late 1800s and registered since 1908. Avery Dennison spends more than $5 million per year advertising its products, including those marketed under the separate "Avery" and "Dennison" trademarks, and the company boasts in the neighborhood of $3 billion in sales of all of its trademarks annually. No evidence indicates what percentage of these dollar figures apply to the "Avery" or "Dennison" trademarks. Avery Dennison maintains a commercial presence on the Internet, marketing its products atand, and maintaining registrations for several other domain-name combinations, all using the TLD .
 
 
 9
 Avery Dennison sued Appellants, alleging trademark dilution under the Federal Trademark Dilution Act and California Business and Professional Code S 14330. Avery Dennison also sued NSI, alleging contributory dilution and contributory infringement. The district court granted summary judgment to NSI on Avery Dennison's claims. The district court then concluded as a matter of law that the disputed trademarks were famous and denied summary judgment to Appellants and granted summary judgment to Avery Dennison on its dilution claims, entering an injunction requiring Appellants to transfer the registrations to Avery Dennison. 983 F. Supp. at 1342.
 
 III
 Trademark Law
 
 10
 Trademark protection is "the law's recognition of the psychological function of symbols." Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co., 316 U.S. 203, 205 (1942). Two goals of trademark law are reflected in the federal scheme. On the one hand, the law seeks to protect consumers who have formed particular associations with a mark. On the other hand, trademark law seeks to protect the investment in a mark made by the owner. Qualitex Co. v. Jacobson Prods. Co., 514 U.S. 159, 163-64 (1995).
 
 
 11
 Until recently, federal law provided protection only against infringement of a registered trademark, or the unregistered trademark analog, unfair competition. See SS 32 & 43(a) of the Lanham Trademark Act of 1946, as amended, 15 U.S.C. SS 1114, 1125(a) (1994). These causes of action require a plaintiff to prove that the defendant is using a mark confusingly similar to a valid, protectable trademark of the plaintiff's. Brookfield, 174 F.3d at 1046.
 
 
 12
 Many states, however, have long recognized another cause of action designed to protect trademarks: trademark dilution. Lori Krafte-Jacobs, Comment, Judicial Interpretation of the Federal Trademark Dilution Act of 1995 , 66 U. Cin. L. Rev. 659, 660-62 (1998) (discussing the evolution of the dilution doctrine). With the 1995 enactment of the Federal Trademark Dilution Act, dilution became a federal-law concern. Unlike infringement and unfair competition laws, in a dilution case competition between the parties and a likelihood of confusion are not required to present a claim for relief. See 15 U.S.C. S 1127 (Supp. II 1996) (definition of "dilution"); Leslie F. Brown, Note, Avery Dennison Corp. v. Sumpton, 14 Berkeley Tech. L.J. 247, 249 (1999). Rather, injunctive relief is available under the FederalTrademark Dilution Act if a plaintiff can establish that (1) its mark is famous; (2) the defendant is making commercial use of the mark in commerce; (3) the defendant's use began after the plaintiff's mark became famous; and (4) the defendant's use presents a likelihood of dilution of the distinctive value of the mark. Panavision Int'l, L.P. v. Toeppen, 141 F.3d 1316, 1324 (9th Cir. 1998) (interpreting 15 U.S.C. S 1125(c)(1)).
 
 
 13
 California's dilution cause of action is substantially similar, providing relief if the plaintiff can demonstrate a "[l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark . . . , notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services. " Cal. Bus. & Prof. Code S 14330. We have interpreted S 14330, like the Federal Trademark Dilution Act, to protect only famous marks. Fruit of the Loom, Inc. v. Girouard, 994 F.2d 1359, 1362-63 (9th Cir. 1993); see 3 J. Thomas McCarthy, Trademarks & Unfair Competition S 24:108 (Supp. 1998).
 
 IV
 Standard of Review
 
 14
 We review the district court's grant of a permanent injunction de novo. Erickson v. United States ex rel. Dep't of Health & Human Servs., 67 F.3d 858, 861 (9th Cir. 1995). To determine the legality of the injunction, we consider de novo the underlying grant of summary judgment to Avery Dennison and denial of summary judgment to Appellants. See Margolis v. Ryan, 140 F.3d 850, 852 (9th Cir. 1998). Viewing the evidence in the light most favorable to the non-moving party, summary judgment is appropriate if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Id.
 
 V
 Dilution Protection
 
 15
 We now turn to the dilution causes of action at issue in this case, brought under the Federal Trademark Dilution Act and California Business and Professional Code S 14330.
 
 
 16
 In Panavision, we held that both the Federal Trademark Dilution Act and S 14330 were implicated when the defendant registered domain-name combinations using famous trademarks and sought to sell the registrations to the trademark owners. 141 F.3d at 1318, 1327. Three differences made Panavision easier than the instant case. First, the defendant did not mount a challenge on the famousness prong of the dilution tests. Panavision, 141 F.3d at 1324. Second, the Panavision defendant did not challenge the factual assertion that he sought to profit by arbitrage with famous trademarks. Id. at 1324-25. Third, the diluting registrations in Panavision both involved the TLD . In the instant case, by contrast, Appellants contest Avery Dennison's claim of famousness, Appellants contend that the nature of their business makes the trademark status of "Avery" and "Dennison" irrelevant, and the complained-of registrations involve the TLD .
 
 
 17
 * Famousness
 
 
 18
 The district court considered evidence submitted by Avery Dennison regarding marketing efforts and consumer association with its marks and concluded as a matter of law that "Avery" and "Dennison" were famous marks entitled to dilution protection. 999 F. Supp. at 1339. We hold that Avery Dennison failed to create a genuine issue of fact on the famousness element of both dilution statutes.[4]
 
 
 19
 Dilution is a cause of action invented and reserved for a select class of marks -- those marks with such powerful consumer associations that even non-competing uses can impinge on their value. See generally Frank L. Schechter, The Rational Basis for Trademark Protection, 40 Harv. L. Rev. 813 (1927) (proposing a cause of action for dilution); Krafte-Jacobs, supra, at 689-91. Dilution causes of action, much more so than infringement and unfair competition laws, tread very close to granting "rights in gross" in a trademark. See 3 McCarthy, supra, S 24:108. In the infringement and unfair competition scenario, where the less famous a trademark, the less the chance that consumers will be confused as to origin, see AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 349 (9th Cir. 1979), a carefully-crafted balance exists between protecting a trademark and permitting non-infringing uses. In the dilution context, likelihood of confusion is irrelevant. See 15 U.S.C. S 1127; Cal. Bus. & Prof. Code S 14330; Panavision, 141 F.3d at 1326. If dilution protection were accorded to trademarks based only on a showing of inherent or acquired distinctiveness, we would upset the balance in favor of overprotecting trademarks, at the expense of potential noninfringing uses. See Fruit of the Loom, 994 F.2d at 1363 ("[The plaintiff] would sweep clean the many business uses of this quotidian word.").
 
 
 20
 We view the famousness prong of both dilution analyses as reinstating the balance -- by carefully limiting the class of trademarks eligible for dilution protection, Congress and state legislatures granted the most potent form of trademark protection in a manner designed to minimize undue impact on other uses. See San Francisco Arts & Athletics, Inc. v. United States Olympic Comm., 483 U.S. 522, 564 n.25 (1987) (Brennan, J., dissenting) (citing 2 J. McCarthy, Trademarks & Unfair Competition S 24:16, at 229 (2d ed. 1984)) (discussing limits on the dilution doctrine that help prevent overprotection of trademarks).
 
 
 21
 Therefore, to meet the "famousness" element of protection under the dilution statutes, " `a mark[must] be truly prominent and renowned.' " I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 46 (1st Cir. 1998) (quoting 3 McCarthy, supra, S 24.91). In a 1987 report, which recommended an amendment to the Lanham Act to provide a federal dilution cause of action, the Trademark Review Commission of the United States Trademark Association emphasized the narrow reach of a dilution cause of action: "We believe that a limited category of trademarks, those which are truly famous and registered,[5] are deserving of national protection from dilution." Trademark Review Commission, Report & Recommendations, 77 Trademark Rep. 375, 455 (Sept.-Oct. 1987).
 
 
 22
 The Federal Trademark Dilution Act lists eight nonexclusive considerations for the famousness inquiry, 15 U.S.C. S 1125(c)(1)(A)-(H), which are equally relevant to a famousness determination under Business and Professional Code S 14330, see Panavision, 141 F.3d at 1324 ("Panavision's state law dilution claim is subject to the same analysis as its federal claim."). These are:
 
 
 23
 (A) the degree of inherent or acquired distinctiveness of the mark;
 
 
 24
 (B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used; (C) the duration and extent of advertising and public ity of the mark;
 
 
 25
 (D) the geographical extent of the trading area in which the mark is used;
 
 
 26
 (E) the channels of trade for the goods or services with which the mark is used;
 
 
 27
 (F) the degree of recognition of the mark in the trad ing areas and channels of trade used by the mark's owner and the person against whom the injunction is sought;
 
 
 28
 (G) the nature and extent of use of the same or simi lar marks by third parties; and
 
 
 29
 (H) whether the mark was registered . . . on the prin cipal register.
 
 
 30
 15 U.S.C. S 1125(c)(1).
 
 
 31
 We note the overlap between the statutory famousness considerations and the factors relevant to establishing acquired distinctiveness, which is attained "when the purchasing public associates the [mark] with a single producer or source rather than just the product itself." First Brands Corp. v. Fred Meyer, Inc., 809 F.2d 1378, 1383 (9th Cir. 1987). Proof of acquired distinctiveness is a difficult empirical inquiry which a factfinder must undertake, Taco Cabana Int'l, Inc. v. Two Pesos, Inc., 932 F.2d 1113, 1119-20 & n.7 (5th Cir. 1991), aff'd, 505 U.S. 763 (1992), considering factors including:
 
 
 32
 [1] whether actual purchasers . . . associate the [mark] with [the plaintiff]; [2] the degree and man ner of [the plaintiff's] advertising; [3 ] the length and manner of [the plaintiff's] use of the [mark]; and [4] whether [the plaintiff's] use of the [mark ] has been exclusive.
 
 
 33
 Clamp Mfg. Co. v. Enco Mfg. Co., 870 F.2d 512, 517 (9th Cir. 1989).[6] Furthermore, registration on the principal register creates a presumption of distinctiveness -- in the case of a surname trademark, acquired distinctiveness. 15 U.S.C. S 1057(b) (1994); Americana Trading Inc. v. Russ Berrie & Co., 966 F.2d 1284, 1287 (9th Cir. 1992) ("[R]egistration carries a presumption of secondary meaning.").
 
 
 34
 However, the Federal Trademark Dilution Act and Business and Professional Code S 14330 apply "only to those marks which are both truly distinctive and famous, and therefore most likely to be adversely affected by dilution." S. Rep. No. 100-515, at 42 (emphasis added). The Trademark Review Commission stated that "a higher standard must be employed to gauge the fame of a trademark eligible for this extraordinary remedy." 77 Trademark Rep. at 461. Thus,"[t]o be capable of being diluted, a mark must have a degree of distinctiveness and `strength' beyond that needed to serve as a trademark." 3 McCarthy, supra, S 24:109; see also KrafteJacobs, supra, at 690 ("If all marks are distinctive, and a showing of distinctiveness meets the element of fame, what marks would be outside the protection of the FTDA?[T]he FTDA does not indicate that any particular degree of distinctiveness should end the inquiry." (interpreting the Federal Trademark Dilution Act)). We have previously held likewise under California Business and Professional CodeS 14330. Accuride Int'l, Inc. v. Accuride Corp., 871 F.2d 1531, 1539 (9th Cir. 1989) (requiring more than mere distinctiveness).
 
 
 35
 Applying the famousness factors from the Federal Trademark Dilution Act to the facts of the case at bench, we conclude thatAvery Dennison likely establishes acquired distinctiveness in the "Avery" and "Dennison" trademarks, but goes no further. Because the Federal Trademark Dilution Act requires a showing greater than distinctiveness to meet the threshold element of fame, as a matter of law Avery Dennison has failed to fulfill this burden.
 
 
 36
 * Distinctiveness
 
 
 37
 We begin with the first factor in the statutory list: "inherent or acquired distinctiveness." S 1125(c)(1)(A). No dispute exists that "Avery" and "Dennison " are common surnames -- according to evidence presented by Appellants, respectively the 775th and 1768th most common in the United States. A long-standing principle of trademark law is the right of a person to use his or her own name in connection with a business. See Howe Scale Co. v. Wyckoff, Seamans & Benedict, 198 U.S. 118, 140 (1905). This principle was incorporated into the Lanham Act, which states that a mark that is "primarily merely a surname" is not protectable unless it acquires secondary meaning. 15 U.S.C. S 1052(e)(4), (f) (1994); Abraham Zion Corp. v. Lebow, 761 F.2d 93, 104 (2d Cir. 1985); see L.E. Waterman Co. v. Modern Pen Co., 235 U.S. 88, 94 (1914) (pre-Lanham Act case stating that protection from confusion is available to the holder of a surname trademark that has acquired public recognition); Horlick's Malted Milk Corp. v. Horluck's, Inc., 59 F.2d 13, 15 (9th Cir. 1932) (pre-Lanham Act case limiting the defendant's right to use his surname as a trademark where the name had acquired public recognition from the efforts of a competitor). Avery Dennison cannot claim that "Avery" and "Dennison" are inherently distinctive, but must demonstrate acquired distinctiveness through secondary meaning.
 
 
 38
 The drafters of the Federal Trademark Dilution Act continued the concern for surnames when adding protection against trademark dilution to the federal scheme. On early consideration of the Act, the report from the Senate Judiciary Committee emphasized: "[T]he committee intended to give special protection to an individual's ability to use his or her own name in good faith." S. Rep. No. 100-515, at 43 (1988). The Federal Trademark Dilution Act imports, at a minimum, the threshold secondary-meaning requirement for registration of a surname trademark.
 
 
 39
 Avery Dennison maintains registrations of both "Avery" and "Dennison" on the principal register, prima facie evidence that these marks have achieved the secondary meaning required for protection from infringement and unfair competition. See Americana Trading, 966 F.2d at 1287. We reject Appellants' argument that the distinctiveness required for famousness under the Federal Trademark Dilution Act is inherent, not merely acquired distinctiveness. See 15 U.S.C. S 1125(c)(1)(A) (referring to "inherent or acquired distinctiveness"). However, because famousness requires a showing greater than mere distinctiveness, the presumptive secondary meaning associated with "Avery" and "Dennison" fails to persuade us that the famousness prong is met in this case.
 
 2
 Overlapping Channels of Trade
 
 40
 We next consider the fifth and sixth factors of the statutory inquiry: the channels of trade for the plaintiff's goods and the degree of recognition of the mark in the trading areas and channels of trade used by plaintiff and defendant. S 1125(c)(1)(E), (F). The drafters of the Federal Trademark Dilution Act broke from the Trademark Review Commission's recommendation that only marks "which have become famous throughout a substantial part of the United States" could qualify for protection. Report & Recommendation, 77 Trademark Rep. at 456. Instead, fame in a localized trading area may meet the threshold element under theAct if plaintiff's trading area includes the trading area of the defendant. S. Rep. No. 100-515, at 43; Washington Speakers Bureau, Inc. v. Leading Auths., Inc., 33 F. Supp. 2d 488, 503-04 (E.D. Va. 1999) (citing I.P. Lund, 163 F.3d at 46; Teletech Customer Care Mgt., Inc. v. TeleTech Co., 977 F. Supp. 1407, 1413 (C.D. Cal. 1997)). The rule is likewise for specialized market segments: specialized fame can be adequate only if the "diluting uses are directed narrowly at the same market segment." Washington Speakers, 33 F. Supp. 2d at 503. No evidence on the record supports Avery Dennison's position on these two prongs of the famousness inquiry.
 
 
 41
 In Teletech, fame in a narrow market segment was present when the plaintiff showed "that the Teletech Companies may be the largest provider of primarily inbound integrated telephone and Internet customer care nationwide. " 977 F. Supp. at 1409. The defendant was "a contractor providing engineering and installation services to the telecommunications industry," and maintained the domain-name combination, <teletech.com>. Id. at 1409-10. The court held that the showing on the threshold element under the Federal Trademark Dilution Act was adequate to qualify for a preliminary injunction. Id. at 1413. In Washington Speakers, both the plaintiff and defendant were in the business of scheduling speaking engagements for well-known lecturers. 33 F. Supp. 2d at 490, 503 & n.31 (citing cases). In the instant case, by contrast, Appellants' sought-after customer base is Internet users who desire vanity e-mail addresses, and Avery Dennison's customer base includes purchasers of office products and industrial fasteners. No evidence demonstrates that Avery Dennison possesses any degree of recognition among Internet users or that Appellants direct their e-mail services at Avery Dennison's customer base.
 
 3
 Use of the Marks by Third Parties
 
 42
 The seventh factor, "the nature and extent of use of the same . . . marks by third parties," S 1125(c)(1)(G), undercuts the district court's conclusion as well. All relevant evidence on the record tends to establish that both "Avery " and "Dennison" are commonly used as trademarks, both on and off of the Internet, by parties other than Avery Dennison. This evidence is relevant because, when "a mark is in widespread use, it may not be famous for the goods or services of one business." Report & Recommendation, 77 Trademark Rep. at 461; see Accuride, 871 F.2d at 1539 (affirming the district court's holding that widespread use of elements of a trademark helped to defeat a dilution claim).
 
 
 43
 The record includes copies of five trademark registrations for "Avery" and "Averys," a computer printout of a list of several businesses with "Avery" in their names who market products on the Internet, and a list of business names including "Avery," which, according to a declaration submitted by NSI, is a representative sample of over 800 such businesses. The record also contains a computer printout of a list of several businesses with "Dennison" in their names which market products on the Internet and a list of business names including "Dennison," a representative sample of over 200 such businesses. Such widespread use of "Avery" and "Dennison" makes it unlikely that either can be considered a famous mark eligible for the dilution cause of action.
 
 4
 Other Famousness Factors
 
 44
 Avery Dennison argues that evidence of extensive advertising and sales, international operations, and consumer awareness suffices to establish fame. We agree that the remaining four statutory factors in the famousness inquiry likely support Avery Dennison's position. Both "Avery" and "Dennison" have been used as trademarks for large fractions of a century and registered for decades. Avery Dennison expends substantial sums annually advertisingeach mark, with some presumable degree of success due to Avery Dennison's significant annual volume of sales. In addition, Avery Dennison markets its goods internationally. See 15 U.S.C. S 1125(c)(1)(B)-(D), (G). However, we disagree that Avery Dennison's showing establishes fame.
 
 
 45
 Avery Dennison submitted three market research studies regarding perceptions of the "Avery" and "Avery Dennison" brands. Discussion groups through which one study was conducted were formed "using Avery client lists, " and produced the conclusion that the "Avery" name has "positive associations . . . among current customers." Surveyed persons in the other two studies were mostly "users and purchasers of office products" and "[o]ffice supply consumers. " The one consumer group that did not necessarily include office supply purchasers for businesses was still required to be "somewhat" or "very" familiar with Avery products in order to be counted.
 
 
 46
 Avery Dennison's marketing reports are comparable to a survey we discussed in Anti-Monopoly, Inc. v. General Mills Fun Group, Inc., 684 F.2d 1316 (9th Cir. 1981), proving only the near tautology that consumers already acquainted with Avery and Avery Dennison products are familiar with Avery Dennison. See id. at 1323-24. The marketing reports add nothing to the discussion of whether consumers in general have any brand association with "Avery" and "Avery Dennison," and no evidence of product awareness relates specifically to the "Dennison" trademark. Although proper consumer surveys might be highly relevant to a showing of fame, we reject any reliance on the flawed reports submitted by Avery Dennison.
 
 
 47
 Finally, Avery Dennison -- like any company marketing on the Internet -- markets its products worldwide. See 15 U.S.C. S 1125(c)(1)(D). By itself, this factor carries no weight; worldwide use of a non-famous mark does not establish fame. Because famousness requires more than mere distinctiveness, and Avery Dennison's showing goes no further than establishing secondary meaning, we hold that Avery Dennison has not met its burden to create a genuine issue of fact that its marks are famous. Avery Dennison's failure to fulfill its burden on this required element of both dilution causes of action mandates summary judgment for Appellants.
 
 5
 Likelihood of Confusion Remains Irrelevant
 
 48
 We recognize that our discussion of the breadth of fame and overlapping market segments begins to sound like a likelihood of confusion analysis, and we agree with Avery Dennison that likelihood of confusion should not be considered under either the Federal Trademark Dilution Act or Business and Professional Code S 14330. However, as we discuss above, the famousness element of the dilution causes of action serves the same general purpose as the likelihood of confusion element of an infringement or unfair competition analysis -- preventing the trademark scheme from granting excessively broad protection at the expense of legitimate uses. See Fruit of the Loom, 994 F.2d at 1363 ("Whittling away will not occur unless there is at least some subliminal connection in a buyer's mind between the two parties' uses of their marks."). The close parallels between the two analyses are therefore not surprising; nor do they cause us concern.
 
 B
 Commercial Use
 
 49
 Addressing the second element of a cause of action under the Federal Trademark Dilution Act, the district court held that Appellants' registration of <avery.net> and <dennison.net> constituted commercial use. 999 F. Supp. at 1339-40. We disagree.
 
 
 50
 Commercial use under the Federal Trademark Dilution Act requires the defendant to be using the trademark as a trademark, capitalizing on its trademark status. See Panavision, 141 F.3d at 1325. Courts have phrased this requirement in various ways. In a classic "cybersquatter" case, one court referenced the defendants "intention to arbitrage" the registration which included the plaintiff's trademark. Intermatic, 947 F. Supp. at 1239. Another court, whose decision we affirmed, noted that the defendant "traded on the value of marks as marks." Panavision Int'l, L.P. v. Toeppen, 945 F. Supp. 1296, 1303 (C.D. Cal. 1996), aff'd , 141 F.3d 1316 (9th Cir. 1998). In our Panavision decision, we considered the defendant's "attempt to sell the trademarks themselves." 141 F.3d at 1325.
 
 
 51
 All evidence in the record indicates that Appellants register common surnames in domain-name combinations and license e-mail addresses using those surnames, with the consequent intent to capitalize on the surname status of "Avery" and "Dennison." Appellants do not use trademarks qua trade- marks as required by the caselaw to establish commercial use. Rather, Appellants use words that happen to be trademarks for their non-trademark value. The district court erred in holding that Appellants' use of <avery.net> and <dennison.net> constituted commercial use under the Federal Trademark Dilution Act, and this essential element of the dilution causes of action likewise mandates summary judgment for Appellants.
 
 C
 Dilution
 
 52
 The district court then considered the dilution requirement under both statutes, holding that Appellants' use of <avery.net> and <dennison.net> caused dilution, or a likelihood of dilution, of "Avery" and "Dennison. " 999 F. Supp. at 1340-41. We hold that genuine issues of fact on this element of the causes of action should have precluded summary judgment for Avery Dennison.
 
 
 53
 Two theories of dilution are implicated in this case. First, Avery Dennison argues that Appellants' conduct is the cybersquatting dilution that we recognized in Panavision. See 141 F.3d at 1326-27. Second, Avery Dennison argues that Appellants' conduct in housing the <avery.net> and <dennison.net> domain names in the same database as various lewd SLDs causes tarnishment of the "Avery" and "Dennison" marks.
 
 
 54
 * Cybersquatting
 
 
 55
 Cybersquatting dilution is the diminishment of " `the capacity of the [plaintiff's] marks to identify and distinguish the [plaintiff's] goods and services on the Internet.' " Panavision, 141 F.3d at 1326 (quoting the Panavision district court, 945 F. Supp. at 1304). We recognized that this can occur if potential customers cannot find a web page at <trademark.com>. Id. at 1327; see also Brookfield, 174 F.3d at 1045 ("The Web surfer who assumes that " `X'.com" will always correspond to the web site of company X or trademark X will, however, sometimes be misled."). Dilution occurs because " `[p]rospective users of plaintiff's services . . . may fail to continue to search for plaintiff's own home page, due to anger, frustration or the belief that plaintiff's home page does not exist.' " Panavision, 141 F.3d at 1327 (quoting Jews for Jesus v. Brodsky, 993 F. Supp. 282, 306-07 (D.N.J. 1998)).
 
 
 56
 In the instant case, Appellants registered the TLD <.net>, rather than <.com>, with the SLDs <avery> and <dennison>. As we recognized in Panavision, <.net> applies to networks and <.com> applies to commercial entities. 141 F.3d at 1318. Evidence on the record supports this distinction, and courts applying the dilution cause of action to domainname registrations have universally considered <trademark.com> registrations.See Brown, Note, supra, at 251-54 (discussing cases); id. at 262-63 (addressing the <.com> versus <.net> distinction). Although evidence on the record also demonstrates that the <.com> and <.net> distinction is illusory, a fact finder could infer that dilution does not occur with a <trademark.net> registration. This genuine issue of fact on the question of cybersquatting dilution should have prevented summary judgment for Avery Dennison.
 
 2
 Tarnishment
 
 57
 Tarnishment occurs when a defendant's use of a mark similar to a plaintiff's presents a danger that consumers will form unfavorable associations with the mark. See Hasbro, Inc. v. Internet Ent. Group, Ltd., 40 U.S.P.Q.2d 1479, 1480 (W.D. Wash. 1996) (<candyland.com> as a domain-name combination for a sexually explicit web site diluted plaintiff's trademark, "Candyland," for a children's game); 3 McCarthy, supra, S 24:104. The district court did not reach Avery Dennison's claims regarding tarnishment.
 
 
 58
 Avery Dennison offers, as an alternative ground for affirming the district court, the fact that Appellants house <avery.net> and <dennison.net> at the same web site as lewd domain-name registrations. However, the evidence likewise indicates that to move from <avery.net> or dennison.net> to a lewd SLD requires "linking" through the Mailbank home page, which might remove any association with the "Avery" and "Dennison" trademarks that the Internet user might have had. See Fruit of the Loom, 994 F.2d at 1363 (requiring some connection between the two parties' uses of their marks). Whether Appellants' use of the registrations presents a danger of tarnishment is an issue of fact that could not be decided on summary judgment.
 
 D
 Injunction
 
 59
 Under the Federal Trademark Dilution Act and Business and Professional Code S 14330, an injunction may issue if Appellants' conduct dilutes, or is likely to dilute, Avery Dennison's trademarks. 15 U.S.C. S 1125(c)(1); Cal. Bus. & Prof. Code S 14330. Actual success on the merits of a claim is required for a permanent injunction. Walters v. Reno, 145 F.3d 1032, 1048 (9th Cir. 1998). Because we conclude that the district erred as a matter of law in finding "Avery" and "Dennison" to be famous and Appellants' use of <avery.net> and <dennison.net> to be commercial use, and because genuine issues of material fact existed as to whether Appellants' use of the domain-name registrations dilutes or is likely to dilute Avery Dennison's marks, the district court necessarily erred in granting Avery Dennison an injunction.
 
 VI
 Attorneys' Fees
 
 60
 Finally, we address Appellants' application for attorneys' fees. The Lanham Act permits an award of attorneys' fees to a prevailing party "in exceptional cases." 15 U.S.C. S 1117(a). Imposition of attorneys' fees is warranted if " `a plaintiff's case is groundless, unreasonable, vexatious, or pursued in bad faith.' " Stephen W. Boney, Inc. v. Boney Servs., Inc., 127 F.3d 821, 826-27 (9th Cir. 1997) (quoting Scott Fetzer Co. v. Williamson, 101 F.3d 549, 555 (8th Cir. 1996)).
 
 
 61
 As an appellate court, we are ill-equipped to determine Avery Dennison's motivation for bringing and pursuing this litigation. We therefore remand the attorneys' fees question to the district court for determination.
 
 VII
 Conclusion
 
 62
 We reverse the district court's summary judgment in favor of Avery Dennison and remand with instructions to enter summary judgment for Sumpton and Freeview. We also remand Appellants' request for attorneys' fees for a determination by the district court. Finally, we deny Avery Dennison's motion to strike portions of Appellants' brief, and we deny Appellants' request for judicial notice.
 
 
 63
 REVERSED and REMANDED.
 
 
 
 Notes:
 
 
 [1]
 At the time of publication of this opinion, NSI is no longer the exclusive registrar of domain names. A new competitive scheme is being implemented by the Commerce Department, and one competitor, "register.com," is currently in operation. See generally Jeri Clausing, 3-Week Delay in Opening Up Internet Name Registration, N.Y. Times, June 28, 1999, at B10.
 
 
 [2]
 Although initial character strings other than <www.> are also used, see, e.g., Michael K. Lindsey, Just an Address, Los Angeles Daily Journal, Friday, June 18, 1999, at 7 (citing a web page at <http://wipo2.wipo.int>), we only consider <www.>, which stands for "World-Wide Web."
 
 
 [3]
 Some specific "vulgar" words and a few words that are prevented by federal statute from being used by private entities are not available as SLDs.
 
 
 [4]
 Although the famousness of "Avery" and "Dennison" is disputed, no dispute exists on the third element of dilution under Panavision: Appellants' use must begin after the marks became famous. Any fame that Avery Dennison's marks have acquired existed before November, 1996, when Appellants' use began.
 
 
 [5]
 The Trademark Review Commission's recommended amendment is very similar to the language of the eventually-enacted Federal Trademark Dilution Act. The main difference relevant to the famousness inquiry is that the Commission's recommendation only permitted a cause of action to the owner of a registered mark, while the owner of any protectable mark or trade name can bring a cause of action under the enacted version of the Federal Trademark Dilution Act.
 
 
 [6]
 The Clamp court specifically discussed a trademark in a product configuration, rather than in a word or symbol, and the First Brands and Two Pesos courts dealt with trade dress. However, the analysis is the same. See Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768-76 (1992) (applying the rules applicable to unfair competition to trade dress); Clamp Mfg. Co. v. Enco Mfg. Co., 870 F.2d 512, 515-16 (9th Cir. 1989) (applying the rule for acquired distinctiveness to the design of a product); see generally Graeme B. Dinwoodie, Reconceptualizing the Inherent Distinctiveness of Product Design Trade Dress, 75 N.C. L. Rev. 471 (1997) (discussing the application of trademark infringement and unfair competition law to product design and trade dress).